## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| SONIA BARRAGAN individually and as representative of the estate of ADRIAN BARRAGAN CASTELLANOS | NO. _____ |
| Plaintiffs, | |
| v. | COMPLAINT FOR DAMAGES<br>Personal Injury Action (28 U.S.C. §1332) |
| TOYOTA MOTOR NORTH AMERICA, INC.; TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.; TOYOTA MOTOR SALES, U.S.A., INC; and TOYOTA MOTOR CORPORATION | [DEMAND FOR JURY TRIAL] |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW Plaintiff SONIA BARRAGAN individually and as representative of the estate of ADRIAN BARRAGAN CASTELLANOS ("Plaintiff"), by and through her counsel, and alleges as follows:

### INTRODUCTION

1. This action seeks to recover damages arising from the death of ADRIAN BARRAGAN CASTELLANOS suffered as a result of a crash caused by the sudden and unintentional acceleration of the 2015 Toyota Camry (VIN 4T1BF1FK1FU075874) ("subject vehicle") he was driving.

2. For the past 50 years, Toyota has publicly committed itself to building the safest and most reliable cars on the road.  Toyota gained trust and loyalty from American consumers, who, in turn, established Toyota's position in 2008 as the number one brand of cars sold in the United States.  However, Toyota breached that trust.

3. In the fall of 2009, news spread that California Highway Patrol Officer Mark Saylor and his family died in a crash after a 2009 Lexus ES 350 that he was driving accelerated out of control.  This incident shocked and alarmed the American public, sparking investigations into the extent of unintended acceleration ("UA") incidents, what Toyota knew, and when they knew it.  Internal company documents revealed that Toyota concealed information about UA problems with its vehicles, including the true nature of the defect and the number of resulting incidents, injuries, and deaths.

4. From 2002 to 2010, Toyota continuously denied any problems with the throttle control systems on its vehicles.  Meanwhile, as a Congressional probe uncovered, Toyota received more than 37,900 reports from customers describing unintended acceleration, surging and/or speed control problems across many models and years.

5. The UA phenomenon is both real and terrifying.  Toyota's own data projects that UA has accounted for, at least, 760 crashes.  Independent safety researchers estimate that UA-related crashes have led to 341 injuries and 19 deaths.

6. All Toyota vehicles with the electronic throttle control system ("ETCS") (beginning extensively in Model Year 2002, and some dating back to Model Year 1998) contain design defects that cause sudden and uncontrolled acceleration to speeds of up to 100 miles per hour or more.

7.  The affected vehicles are defective because they experience UA events and because they lack a mechanism, such as a brake override system, to prevent, mitigate, or stop a UA event.

8.  Specifically, there are at least four design defects in these vehicles that cause or contribute to dangerous UA incidents.

9.  First, these vehicles have an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including UA.

10. Second, the ETCS, ECM and related systems are highly susceptible to malfunction caused by various electronic failures, including but not limited to faulty circuit boards, short circuits, software failures, software glitches, and electromagnetic interference from sources outside the vehicle.

11. Third, these vehicles lack brake override and brake assist systems, meaning that the driver is unable to manually stop or slow the engine during a UA incident by stepping on the brakes.  The absence of an effective fail-safe measure is particularly dangerous given the propensity of Toyota vehicles to suddenly accelerate.

12. Fourth, the subject vehicle contains an accelerator pedal defect that has been subject to a recall (NHTSA Recall 09V388000), which may lead to a stuck accelerator pedal in the wide-open position, that may result in very high vehicle speeds and make it difficult to stop the vehicle, which could cause a crash, serious injury or death.

13. These defects alone, or in combination, render certain Toyota vehicles unreasonably dangerous and unable to perform as safely as an ordinary consumer would expect.

14. Toyota could have easily implemented a brake override and brake assist system years ago, which would have prevented UA-related incidents, regardless of the precise cause.  With a

brake override and brake assist system, when a UA event begins to occur, drivers can override the acceleration or surging by pressing the brake.  From at least 2002, Toyota knew or should have known that the state of the art in the automotive industry for electronic throttle control systems included the installation of a brake override system.

15. Internal company documents show that by at least 2007, Toyota knew that installing a brake override system could prevent UA events.  Toyota manager Koji Sakakibara stated in a document dated September 1, 2009 that "during the floor mat sticking issue in 2007 TMS (likely refers to Toyota Motor Sales) suggested that there should be failsafe option similar to that used by other companies to prevent unintended acceleration."  However, Toyota did not heed that suggestion. Sakakibara stated that "Information concerning the sequential inclusion of a failsafe system would be given by Toyota to NHTSA when Toyota was invited in 2008."

16. Despite the feasibility and availability of a brake override system, and despite the fact that Toyota's internal documents show that Toyota was aware of the UA problem, Toyota negligently and recklessly failed to install this protective measure in its vehicles.

17. Even in late 2009 and early 2010 when Toyota announced recalls involving a brake override system, Toyota purposely hid the fact that this redesign was safety-related and critical to preventing UA.  Instead, Toyota claimed that the brake override system was "being added as an extra measure of confidence for Toyota owners."

18. When pressed to explain and implement solutions to UA, Toyota issued recalls to address alleged mechanical issues, such as defective floor mats and sticky accelerator pedals. While these problems undoubtedly posed real dangers for some drivers, a far greater number of vehicles were affected by the ETCS design defects described herein.  Indeed,

the "sticky pedal" and "floor mat" recalls have failed to adequately address the UA problem.  Drivers continue to report UA incidents in vehicles that were not part of the recalls.  Likewise, even among vehicles that were recalled and repaired, drivers continue to report experiences of UA.

19. Toyota effectively used these "floor mat" and "sticky pedal" problems to downplay and divert attention away from the major design defects and safety problems with the ETCS, including the need for a brake override system. Rather than revealing the truth about its UA electronic/software/hardware defects, Toyota highlighted and promoted the floor mat and pedal recalls as a "smoke screen," while at the same time misleadingly characterizing the "reflashing" of the computer software to allow for brake override as merely a "confidence" boost.

20. Statements from Toyota's leadership at the highest levels reveal that Toyota knows and has known that its vehicles present an unreasonable danger, in that they are subject to UA as a result of defects in their design and manufacture, and confirm that Toyota has acted carelessly and recklessly in addressing this problem:

a. Koji Sakakibara, a Toyota manager, knew in 2007 that other auto companies had installed brake override systems to prevent UA;

b. Toyota Motor Corporation's CEO, Akio Toyoda, acknowledged that Toyota had grown too quickly;

c. Toyota Motor Sales President, James Lentz, admitted that the floor mat and pedal recalls do not totally solve the unintended acceleration problem;

d. Toyota North America's President, Yoshimi Inaba, conceded that "Toyota has not lived up to its high standards"; and

e. Toyota Motor Corporation's Executive Vice President, Shinichi Sasaki concluded that Toyota did not listen to "many voices" of unintended acceleration.

21. Toyota promised trust and safety, but delivered neither.  Rather than recalling the problematic vehicles and implementing a feasible and readily available brake override system, Toyota hid the problem and proposed inadequate and misleading solutions. Toyota's actions have resulted in preventable UA incidents, leading to numerous fatalities and injuries, including those suffered by Plaintiff.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship among the parties.

23. This Court has personal jurisdiction over the Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in Texas, the Defendants are authorized to do business in Texas, the Defendants have minimum contacts with Texas, and/or the Defendants otherwise intentionally avail themselves of the markets in Texas through the promotion, marketing and sale of their products in Texas, each of which are sufficient bases to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

24. Venue is proper in the Eastern District of Texas, Beaumont Division pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events, acts and omissions giving rise to these claims occurred in the that district and division.

## PARTIES

25. At all times herein mentioned, Plaintiff SONIA BARRAGAN was and is a resident and citizen of Texas.

26. At all relevant times prior to his death, ADRIAN BARRAGAN CASTELLANOS was a resident and citizen of Texas.

27. At all times herein mentioned, Defendant Toyota Motor North America, Inc. was and is a California corporation and a resident and corporate citizen of California, with its principal place of business at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles, in the State of California.

28. At all times herein mentioned, Defendant Toyota Motor Engineering & Manufacturing North America, Inc. was and is a Kentucky corporation and a resident and corporate citizen of Kentucky, with its principal place of business located at 25 Atlantic Avenue, in the City of Erlanger, in the State of Kentucky.

29. At all times herein mentioned, Defendant Toyota Motor Sales, U.S.A., Inc. was and is a California corporation and a resident and corporate citizen of California, with its principal place of business at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles, in the State of California.

30. Upon information and belief, each Toyota entity named above is a wholly owned subsidiary of Defendant Toyota Motor Corporation, a Japanese corporation with its principal place of business located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-3571, Japan.

31. At all times herein mentioned, Defendants Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Corporation (collectively, "Toyota" or "Defendants") designed,

engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and/or sold Toyota vehicles, including the vehicle operated by the ADRIAN BARRAGAN CASTELLANOS.

32. At all times herein mentioned, Defendants, and each of them, were acting as agents and employees of each of the other Defendants, and were acting within the scope, purpose, and authority of that agency and employment and with the full knowledge, permission, and consent of each of the other Defendants.

## FACTUAL ALLEGATIONS

### I.   Toyota's Unintended Acceleration Defect

### A.   Overview of Toyota's Success and The Toyota Brand

33. Toyota came to America in 1957, establishing its headquarters in Hollywood, California in an old Rambler dealership.  After a disappointing start, Toyota quickly gained traction in the United States auto market and eventually became a leader.  In 2003, Toyota sold 6,780,000 vehicles and overtook Ford Motor Company to become second in annual sales behind only General Motors. Three years later, Toyota passed General Motors as the number one brand of cars sold in the United States, with 8,800,000 vehicles sold.

34. Toyota is currently the world's largest manufacturer of vehicles.  For the fiscal year ending in March 2010, Toyota reported more than $200 billion in worldwide sales.

35. Toyota holds its brand out as synonymous with "innovation, quality and reliability," claiming that "safety and satisfaction" are its "top priorities." http://www.toyota.com/about/our_business/sales/ (last visited August 17, 2010);

Templin's Statement Regarding Lexus LS Voluntary Safety Recall, available at: http://www.toyota.com/about/news/corporate/2010/05/21-3-LexusLSRecall-MarkTemplin-Statement.html.

36. Since at least 1998, Toyota has continuously promised trust and safety to prospective purchasers and the American public.

**B.       The Toyota Electronic Throttle Control System's Susceptibility to Unintended Acceleration Problems and Lack of Adequate Safeguards**

37. Beginning in the late 1990s, Toyota manufactured, distributed, and sold vehicles with an electronic throttle control system ("ETCS vehicles" or "subject vehicles").

38. Unlike traditional throttle control systems, ETCS has no physical linkage from the accelerator pedal to the engine throttle.  Rather, a sensor at the accelerator detects how far the gas pedal is depressed and transmits that information to computer modules, which control a motorized engine throttle. The computer modules determine how far the accelerator is depressed, and, in turn, tell the engine throttle motor how far to open the throttle valve.

39. When Toyota first introduced the ETCS, it continued to include a mechanical linkage between the accelerator and the engine throttle control.

40. Beginning in Model Year 2002 on most models, and in approximately 1998 on other higher end models, Defendants began manufacturing, distributing, and selling vehicles without such mechanical linkage.

41. The ETCS, as a computer-based system, is highly susceptible to malfunction, or "glitches," caused by various electronic and mechanical failures, including but not limited to short circuits, software errors, and electromagnetic interference from sources outside the vehicle.

42. Despite known hardware, software, and component problems, ETCS vehicles do not have adequate safeguards to protect drivers from UA. The fault detection system in these vehicles is not robust enough to detect and prevent foreseeable UA events.

43. Additionally, the subject vehicles lack a brake override system, incorporated by other vehicle manufacturers, that instructs the ETCS to automatically reduce the engine power to idle whenever the brakes are applied. This measure is critical, as a significant number of motorists that experienced UA reported that no amount of braking would stop the vehicle. Moreover, the absence of a fail-safe brake override system is particularly dangerous given the susceptibility of the ETCS to malfunction in Toyota vehicles.

44. These defects alone, or in combination, are lethal.  In the subject vehicles, an ETCS malfunction can set the engine throttle to any speed, regardless of the position of the accelerator, and the driver has no mechanism to effectively stop or slow the car.

45. While the full scope of the UA problem is still unfolding, Toyota's own data reveals that UA has accounted for at least 760 crashes. Independent safety experts at Safety Research and Strategies, Inc. estimate that UA related crashes have led to approximately 341 injuries and 19 deaths.

### C.      Unintended Acceleration Timeline:   Toyota's Knowledge Regarding the Defects

46. Toyota has received evidence for many years, from a variety of sources that its vehicles have accelerated suddenly and unexpectedly in a variety of scenarios.

47. In February 2002, Toyota received what is believed to be the first consumer complaint alleging that the engine surged while the brakes were depressed.  By August 2002, Toyota had received ten other similar complaints. Toyota Motor Corporation allegedly investigated the surging problem but failed to uncover the root cause.  According to a May

20, 2002 internal report, Toyota claimed that the "root cause of the surging condition remains unknown" and "no known remedy exists for the surging condition at this time."

48. In February 2003, The National Highway Traffic Safety Administration ("NHTSA") conducted its first of many investigations regarding speed control problems in Toyota vehicles.  The first two NHTSA investigations involved the Camry and Solara models.

49. On April 25, 2003, NHTSA issued Defect Petition DP03 003.  The petitioner requested that the agency conduct an analysis of 1997 through 2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal."  The petitioner noted that the NHTSA website contained thirty-six complaints referring specifically to unintended acceleration in Lexus vehicles.  Among the several complaints that described crashes, one complaint described a Lexus that "collided with five other cars in the space of [one half] mile before it could be stopped.

50. In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model.

51. In a May 5, 2003 Field Technical Report (FTR), Toyota admitted that "[s]udden acceleration against our intention," was an "extremely serious problem for customers."  In the FTR, a Toyota technician internally reported an "unwanted acceleration" incident: "We found miss-synchronism between engine speeds and throttle position movement. . . .  Even after replacement of those parts, this problem remains."  The technician requested immediate action due to the "extremely dangerous problem" and continued: "[W]e are also much afraid of frequency of this problem in near future."

52. In July 2003, at an owner's request, NHTSA opened the first probe into UA complaints regarding Lexus sedans.

53. In January 2004, another consumer filed a petition with NHTSA, requesting an investigation into 2002 and 2003 Lexus ES 300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash."

54. In March 2004, NHTSA opened a wider probe into Lexus sedans after receiving another complaint "alleging that the throttle control system fails to properly control engine speed resulting in vehicle surge."   NHTSA also notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models.  Specifically, NHTSA investigated the following complaints from vehicle owners:

> Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system functioned normally.

55. On June 3, 2004, NHTSA investigator Scott Yon sent an email to Christopher Santucci (a high-level Toyota employee in Technical and Regulatory Affairs) that shows a greater than 400 percent difference in "Vehicle Speed" complaints between Camrys with manually controlled throttles and those with electronically controlled throttles.  This statistically significant difference put Toyota on notice that its vehicles with ETCS had a defect that could potentially cause UA.

56. On July 22, 2004, NHTSA closed its investigation into the Lexus sudden acceleration complaints (petition PE04-021) without formally identifying a defect, stating that "[a]

defect trend has not been identified at this time and further use of agency resources does not appear to be warranted."  Citing a lack of resources, NHTSA subsequently turned down two more requests from consumers to investigate the problem.  Significantly, NHTSA conducted no testing of the integrity of the ETCS and did not review any records of Toyota's test reports concerning the ETCS.  Notably, NHTSA did not conduct any tests as to the efficacy of the braking system in an open-throttle condition.

57. In May 2004, a forensic technologist and mechanical engineer examined a vehicle in New Jersey that had experienced a UA event.  They prepared a report that concluded that the vehicle's ETCS was not operating correctly. Toyota received the report on January 13, 2005.

58. In August 2005, NHTSA evaluated the Toyota Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

59. In November 2005, Toyota wrote to NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

60. In January 2006, NHTSA opened a second investigation into Toyota Camry models. NHTSA received questionnaires from Camry owners who reported hundreds of problems with acceleration and braking.  After communicating with Toyota, NHTSA closed the investigation without identifying a specific defect and stated that the claims had "ambiguous significance."

61. In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

62. In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles.  Toyota represented to NHTSA that there was no abnormality in the throttle control system, and instead blamed water damage.  NHTSA closed this investigation without identifying a specific defect, citing "the need to best allocate limited administrative resources."

63. In March 2007, NHTSA launched a probe into the floor mats of Lexus models.  In response, Toyota claimed that the "issue is not a safety concern."  On August 8, 2007, NHTSA's Office of Defect Investigation ("ODI") upgraded this preliminary evaluation to an engineering analysis to investigate UA in a target population of 98,454 model year 2007 Lexus ES 350s.  The Opening Resume for EA07-010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries.  Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then experienced unwanted acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle.  In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

64.  In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to floor mats that purportedly interfered with the accelerator pedal.

65. In January 2008, NHTSA launched a probe into UA problems in Tacoma pickups after receiving notice of 478 incidents with 2004-2008 models.  In response, Toyota told

NHTSA that an investigation was not warranted due to lack of evidence to support drivers'
allegations.

66. In August 2008, NHTSA closed its investigation of the Tacoma without specifically
identifying a defect, despite hundreds of complaints.  The Tacoma probe marked the eighth
investigation into UA problems in Toyota vehicles since 2003.  By August 2008, NHTSA
had received more than 2,600 complaints regarding "run away" Toyota vehicles.

67. Rather than provide appropriate repairs, Toyota often blamed drivers for UA incidents.
Yet, when pressed, Toyota technicians have acknowledged the defects in Toyota vehicles,
such as the experience described in this consumer e-mail, dated February 6, 2009:

> We just got a 2008 LE 4Cyl with the 5spd auto. Only had it two weeks. When
> driving 35-45mph, the tranny will shift up into 5th gear and then basically STAY
> there. As we approach a slight upward grade, the tachometer is stuck at 1200 RPM
> and the whole car shudders and vibrates as the engine "lugs" down. We find
> ourselves constantly playing with the gas pedal in order to FORCE the tranny to
> downshift. Took it to dealer. They......experienced same thing. They said it was
> 'Normal for this model - at this time.' They quietly told me they are getting other
> complaints and look forward to Toyota releasing new programming for the ECU.

68. In April 2009, NHTSA received another petition for an investigation into Toyota vehicles
for throttle-control problems unrelated to floor mat issues.

### D.      Officer Mark Saylor's Tragic Accident and Resulting Worldwide Public Scrutiny, Congressional Probes, And Wider Recalls

69. On August 28, 2009, California Highway Patrol officer Mark  Saylor and his family were
killed when the Toyota vehicle (Lexus ES350) he was operating accelerated out of control

to over 100 mph.  In a chilling "911 call," moments before the crash, a passenger said, "We're in trouble.  There's no brakes."

70. In September 2009, NHTSA and Toyota issued consumer alerts, warning consumers to remove floor mats because of a potential to jam the accelerator, causing sudden unintended acceleration.

71. In October 2009, Toyota continued receiving reports in the United States and Canada that pedals were sticking in certain models.  Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

72. In November 2009

   a. Toyota expanded the floor mat recall by over a million vehicles, and issued a press release claiming that NHTSA found no defect in the vehicles.  NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect."  Toyota publicly apologized for its inaccurate press release.  Ultimately, Toyota included 5.3 million vehicles in the Floor Mat recall.

   b. News outlets continued uncovering evidence of widespread problems, and Toyota's concealment of those problems.  The Los Angeles Times reported that Toyota ignored more than 1,200 UA complaints over the preceding eight years.  Toyota also issued another press release denying proliferating media reports that a problem existed with its ETCS.

    c. Toyota instructed dealers to shorten the gas pedal so it would not interfere with floor mats.

73. In December 2009, NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning.  It opened another investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

74. In January 2010:

    a. Toyota told NHTSA that some vehicles may have "an issue" with sticking accelerator pedals, independent of the floor mat issue (though some vehicles contained both defects).  At NHTSA's command, Toyota initially issued a recall for sticking accelerator pedals affecting 2.3 million vehicles.  It subsequently expanded the "sticky pedal" recall to include a total of 3.4 million vehicles.

    b. United States Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.

    c. Toyota announced that a brake override software "fix" would be applied to its vehicles globally by 2011.

    d. On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized."  Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

75. In February 2010:

    a. Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.

b. Kelly Blue Book said affected Toyota models were devalued as much as five percent.  Edmunds stated that the average devaluation was between four and eight percent.

c. Toyota admitted that there was a brake software problem in 2010 Prius Hybrids. Toyota later recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty brakes (437,000 vehicles worldwide).

**E.       Toyota's Admitted Failure to Meet Consumers' Expectations for Safety**

76. In October 2009, Akio Toyoda (President and CEO of Toyota Motor Corporation) issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern.  I can't begin to express my remorse."

77. Additionally, in his prepared testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives on February 24, 2010, Toyoda admitted that Toyota's growth in recent years was "too quick," and the company's priorities of "first, safety; second, quality; third, volume" had become "confused."  Mr. Toyoda went on to apologize to American consumers, "I regret that this has resulted in the safety issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota drivers have experienced."

78. Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America, Inc., likewise acknowledged that Toyota had failed its customers.  Mr. Inaba testified in the Senate Sub-Committee hearings on the Toyota recalls as follows:

In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts.  As our

president, Akio Toyoda, told members of Congress last week, we sincerely regret

our shortcomings have resulted in the issues associated with our recent recalls.

79. Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before

Congress that Toyota "did not listen to its consumers":

> How this issue came about is because there were many vehicle – excuse me – many
>
> voices were sent to us from the customers, but we really did not listen to every one
>
> of them very carefully, one by one.   We should have really listened to them
>
> carefully and rendered some technical analysis so that it would be connected to our
>
> following product improvement.   However, the quality of this work or the
>
> efficiency of our work or speed with which we worked had become sluggish, or
>
> sort [sic] failed gradually, and this has come to a much larger issue.

## II.    Toyota's Purported Fixes Do Not Address the Root Causes of Unintended Acceleration.

80. Despite the flurry of media attention, NHTSA activity and congressional scrutiny, Toyota

has still not adequately addressed the root cause of UA.

81. While sticky pedals and floor mats likely did contribute to some UA incidents, Toyota used

these issues as a smoke screen to hide the electronic defects in their vehicles.

82. Toyota never made any significant changes to improve the acceleration system and the

ETCS, despite the availability of safe and inexpensive alternative designs and feasible

modifications.   Rather, Toyota has repeatedly stated to consumers, the media, its dealers,

and Congress, that its vehicles' electronic acceleration systems are not the cause of UA

incidents.

83. Despite Toyota's public position, evidence continues to mount that the recalls focused on limited mechanical issues are inadequate to prevent UA, and that the vehicles' electronics cannot be ruled out as a likely cause of the incidents.

84. As The New York Times reported on March 2, 2010, "an analysis of government documents shows that many Toyota Camrys built before 2007, which were not subject to recalls, have been linked to a comparable number of speed-control problems as recalled Camrys." A study of Japan's government records revealed a similar finding. As a result, the U.S. Department of Transportation has included pre-2007 Camrys in their broader investigation of the role that ETCS may be playing in these incidents.

85. Further, affected vehicles that have been recalled and repaired continue to suffer UA incidents. On March 4, 2010, just months after Toyota issued two independent recalls related to UA, NHTSA revealed that it had received over 60 UA complaints in Toyota vehicles that had been repaired pursuant to the recalls. As the Los Angeles Times reported, the complaints included several crashes and at least three injuries. On March 17, 2010, the Associated Press reported that the number of post-recall incidents had reached over 100.

86. The Camry findings and the post-recall incidents greatly undermine Toyota's public position, and confirm that the ETCS is the likely source of UA.

87. Indeed, Toyota admits that the recalls have not addressed the UA problem. When questioned before a Congressional panel, Toyota's top U.S. sales executive, James Lentz, admitted that Toyota could not rule out electronics problems, and that the two recalls would "not totally" solve the problem. Among other potential causes, Mr. Lentz identified software problems, faulty cruise control, and engine revs caused by engaging the air conditioner.

88. Additionally, numerous independent experts have spoken out in recent months to challenge Toyota's inexplicable confidence in its electronic systems.

89. For example, David M. Cummings, executive vice president of the Kelly Technology Group in Santa Barbara, California, has 30 years' experience in building computer systems embedded inside other devices, including nine years as a consultant for the Jet Propulsion Laboratory where he worked on the Mars Pathfinder spacecraft.  In an opinion piece in The Los Angeles Times on March 12, 2010, Mr. Cummings dismissed Toyota's repeated statements that its electronics could not be faulted and explained that there are "software bugs" that simply cannot be reproduced in a laboratory test environment.

90. Toyota knew by 2007 that UA was often not traceable, meaning that failure could not be effectively ruled out.  In an October 19, 2007 e-mail, Chris Tinto admitted: "[O]ne big problem is that no codes are thrown in the ECU so the allege [sic] failure (as far as we know) can not be documented or replicated."  The implications were that "the service tech therefore can't fix anything and has no evidence that any problem exists."

91. The unpredictability of electronics and software is further highlighted by strange—and dangerous—incidents in affected vehicles that received a supposed software upgrade as part of the recall.  As the Los Angeles Times summarized in a March 3, 2010 article:

> A 2007 Camry driver from Sherrill, New York, for example, said that since the repair, the car idles fast in reverse, cruise control does not disengage properly, and various check engine lights come on.  The owner of a 2005 Avalon in Houston, meanwhile, said that following the recall service, his wife stepped on the gas and found that nothing happened, causing it to lose speed on the highway.

92. Toyota knows, or should know, that its electronics are not infallible. Indeed, software problems have arisen in other Toyota vehicles. On February 8, 2010, Toyota announced a voluntary safety recall on some of its models to update software in the vehicle's anti-lock brake system (ABS), in response to braking problems experienced by drivers. This recall involves approximately 133,000 Model Year 2010 Prius vehicles and 14,550 Model Year 2010 Lexus HS 250h vehicles.

93. More generally, over the last two decades, various Toyota and Lexus vehicles have been recalled due to electronics and software defects that led to engine surging, engine racing, and unintended engagement of headlights and taillights, according to a Los Angeles Times, February 14, 2010 article. As far back as 2003, Toyota had to "recalibrate" the Electronic Control Modules in certain 2003 Camrys due to engine "surging."

94. Further, Toyota has known for some time that the inherent complexity and unpredictability of vehicle electronics and software counsels the use of a properly designed brake-to-idle override system that allows drivers to bring a vehicle under control in the event of a UA incident. According to documents presented to Congress, and as reported in The Los Angeles Times, in 2007, NHTSA asked Toyota to consider installing software to prevent sudden acceleration in its vehicles after receiving yet another round of UA complaints in Toyota vehicles.

95. In an internal August 2007 e-mail, entitled "UPDATE on ES 350 investigation," Chris Santucci, a Toyota manager, stated that he and NHTSA investigators discussed fail-safe mechanisms used by other vehicle manufacturers to protect against unintended acceleration, including "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied." Mr. Santucci also noted, "Jeff [Quandt, Chief,

Vehicle Controls Division, Office of Defects Investigation] mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly."

96. Further, a September 1, 2009 email "[t]o all concerned staff" from Koji Sakakibara shows that Toyota was aware of the UA problem back in 2007, but opted not to develop additional safety measures at that time:

> To all concerned staff,
>
> The following information has been received from TMSPQSS Public Affairs Group regarding the above (America ES350 article...addition #2).(Please see photos at the bottom of this mail.) Within America, there are 196 articles on Google News, so the mass media is interested.
>
> **- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration".** I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div".Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008. **(The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)**
>
> ==>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assay structure is the cause, how to secure

the floor mats, the timing for introducing shape improvements). - Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues.

Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

(emphasis added).

97. Not only did Toyota decline to develop additional safety measures, but its officials actually bragged in July 2009 about avoiding a costly whole-scale recall related to sudden acceleration complaints. According to an internal presentation from Toyota's Washington office, a limited recall saved Toyota more than $100 million. The document notes that Toyota's safety officials had saved the company significant expense by limiting the recall to 55,000 floor mats in 2007. "Negotiated 'equipment' recall on Camry/ES re SA (Sudden

Acceleration); saved $100M+, w/ no defect found," the document said.  This internal document is further evidence that Toyota knew about the UA problem and nonetheless decided to avoid a recall of the affected vehicles, in conscious disregard for the safety of consumers, including Plaintiff.

98. After profiting from the inadequate 2007 floor mat recall, and in response to increasing pressure from NHTSA, Toyota conducted an internal feasibility study of brake override technology in 2008.  The study was prompted by a memo from a Toyota employee entitled "Unwanted Acceleration Investigations on Toyota Vehicles."  In light of "increasing scrutiny" from NHTSA, the memo requested that Toyota Motor Corporation (in Japan) conduct a feasibility study evaluating the use of the electronic throttle control system "to reduce throttle opening/engine power" as a way to eliminate sudden acceleration.  The memo's unidentified author noted that simultaneous application of both pedals during an unintended acceleration event "should be easily detectable by the engine ECU."  Toyota ultimately declined to install this important safety feature in any of its vehicles at that time.

99. Unable to hide the risks imposed by its ETCS any longer, Toyota has announced a plan to put brake overrides in new vehicles by the end of 2010.  Additionally, Toyota is allegedly installing the system on some of the following recalled vehicles:  2005-2010 Toyota Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES 350, 2006-2010 Lexus IS 350, and 2006-2010 Lexus IS 250.  As Toyota stated in connection with this second recall:

> In addition, as a separate measure independent of the vehicle-based remedy, Toyota will install a brake override system into the involved Camry, Avalon, and Lexus ES 350, IS 350 and IS 250 models as an extra measure of confidence.  This system

cuts engine power in case of simultaneous application of both the accelerator pedal and brake pedals.

100. Yet, Toyota has failed to install this safety feature on all the recalled vehicles, let alone the larger universe of affected vehicles.

101. Not only has Toyota denied this important safeguard to millions of its customers, but the failsafe it has installed on select vehicles appears to be ineffective and inadequately tested. As noted above, drivers have reported more than 100 UA incidents in vehicles successfully recalled and repaired. Frighteningly, these new complaints involve the Avalon, Camry, and Matrix – all of which allegedly received brake override software as part of the recall, according to Toyota.

### III. Toyota's Violation of the Vehicle Safety Act And "Secret Recall" Scheme

102. Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. § 30101 et seq., and the Transportation Recall Enhancement, Accountability, and Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, Toyota is required to recall and repair motor vehicle defects related to safety.

103. If a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must inform the Secretary of Transportation. 49 U.S.C. § 30118(c)(1) & (2).

104. The Safety Act requires that manufacturers inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." The report to NHTSA must immediately include the following:

   a. The manufacturer's name;

    b.   The identification of the vehicles or equipment containing the defect, including:

- The make, line, model year and years of manufacturing;

- A description of the basis for the determination of the recall population;

- How those vehicles differ from similar vehicles that the manufacturer excluded from the recall;

- A description of the defect.

    o.   The manufacturer must also inform NHTSA, as soon as possible, regarding:

- The total number of vehicles or equipment potentially containing the defect;

- The percentage of vehicles estimated to contain the defect;

- A chronology of all principle events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt;

- A description of the plan to remedy the defect.

105. If the Secretary of Transportation determines that the vehicle is defective, it will require the manufacturer to notify the owners, purchasers and dealers of the defect and require it to remedy the defect or noncompliance. 49 U.S.C. § 30118(b)(2)(A) & (B).

106. As described in detail above, since at least 2002, Defendants have known about safety-related UA defects in their vehicles.

107. Plaintiff alleges upon information and belief that Defendants have known for many years, but have not disclosed to NHTSA or the public, how to fix UA defects.

108. Plaintiff alleges upon information and belief that Defendants have silently been installing brake override software in vehicles brought in for service unrelated to UA, or when performing recalls on non-ETC parts, such as pedals or floor mats.

109. Defendants never informed NHTSA about known electronic defects in their throttle control system, nor did they give NHTSA an opportunity to evaluate the brake override remedy.  Consequently, the public, including Plaintiff, never received any notice of either the nature of the electronic UA defect nor Defendants' proposed fix.

## IV.     **Toyota's Concealment of The Defects**

110. As demonstrated above, Toyota was aware of the defective nature of the acceleration control and throttle system in its vehicles since at least 2002, but failed to adequately and accurately disclose these facts to Plaintiff, the public, and NHTSA.  Toyota concealed these facts and continued to make statements touting the reliability and safety of its vehicles, including the subject vehicles with dangerous defects that Toyota knew had caused and were likely to cause further serious injuries and deaths.

### A.     **Toyota's Failure to Disclose That Certain Vehicles Had Electronics Problems That Caused Unintended Acceleration**

111. Toyota has consistently denied any electronic causes of UA, while quietly issuing bulletins to fix problems with its electronic throttles.

112. Between August 2002 and May 2003, Toyota issued to its dealers three "Technical Service Bulletins," which acknowledged surging problems in certain Camry vehicles. Two of these bulletins advised dealers that Toyota made repairs to the Engine Control Model (an electronic system) to correct the problem. Toyota never disclosed the existence or content of these bulletins to NHTSA or the public.

**B.**    <u>Toyota's Concealment of Its Own Technicians' Ability to Replicate and Confirm Unintended Acceleration Events</u>

113. During the relevant period, Toyota failed to disclose to consumers how its own technicians were continuing to replicate UA events.

114. In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model.  Toyota blamed a "faulty trim panel clip," deemed it an isolated incident, and did not make such information available to NHTSA until five years later.

115. As discussed above, in a May 5, 2003 "Field Technical Report, Toyota admitted that "[s]udden acceleration against our intention," was an "extremely serious problem for customers."  A Toyota technician internally reported an "unwanted acceleration" incident: "We found miss-synchronism between engine speeds and throttle position movement. . . . Even after replacement of those parts, this problem remains."  The author requested immediate action due to the "extremely dangerous problem" and continued: "[W]e are also much afraid of frequency of this problem in near future."

116. Between 2006 and 2010, two Toyota technicians in Hong Kong witnessed eighteen incidents of UA.  These incidents, documented in Field Technical Reports ("FTR"), show that Toyota knew of the frequency of UA in their vehicles and that its own dealers recognized this and advised Toyota that it was urgent to investigate.

117. On June 8, 2007, in a FTR, one of the Toyota technicians in Hong Kong reportedly experienced UA during routine maintenance of a vehicle at a Lexus Service Center.  The technician stated that "[a]lthough the accelerator pedal had been released, the engine still maintained at high speed (over 5500 rpm) and it went on to the red zone."  He goes on to describe how "[t]he accelerator pedal was inspected, but no abnormality was found, no

DTC was found and the carpet is genuine Lexus parts and no aftermarket carpet was fitted." The technician "strongly request[ed] TMC to investigate this case in a very top priority, since the case is highly related to vehicle safety and there is a highly potential danger [sic] of severe traffic accident." This incident is the third of its kind within eight months. Over the course of three years, the same two technicians report fifteen more cases to Toyota.

118. In another FTR from one of the technicians in Hong Kong, dated September 28, 2007, a similar UA event was reported with a targeted investigation of the ETCS. There were no DTCs recorded and the root cause was unknown. The resulting report by Denso Corporation, the manufacturer of the accelerator pedals in many of the subject vehicles, confirmed that they could not find any abnormalities on any accelerator components. In the corresponding reply from TMC, dated April 21, 2008, Toyota acknowledged that this was an issue that needed to be monitored.

119. Additionally, in a December 12, 2008 Field Technical Report regarding a UA event, a technician stated: "After traveling 20-30 feet the vehicle exhibited a slight hesitation then began to accelerate on its own. Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence...Probable Cause =Unknown." Toyota hid these reports and continued to deny that UA existed.

C.      **Toyota's Attempts to Deliberately Frustrate Government Investigations and Conceal Information from The Public and NHTSA Regarding Unintended Acceleration Problems**

120. Toyota successfully delayed and narrowed NHTSA investigations through, in part, a cozy relationship between NHTSA's designated Toyota investigator, Scott Yon, and Toyota executives, some of whom were former NHTSA employees.

121. In March 2004, NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in Lexus sedans and 20022003 Camry and Solara models. The investigation was expected to cover more than one million 2002-2003 Camry, Camry Solara, and Lexus ES 300 vehicles, as the agency had received 37 complaints and reports of 30 crashes resulting in five injuries. Toyota successfully narrowed the investigation to eleven incidents involving five crashes.

122. At the outset of this March 2004 investigation, NHTSA asked Toyota for information on similar incidents including the number of complaints, field reports, crash reports, property damage claims and lawsuits.  The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, California.  The scope of NHTSA's information request became the subject of negotiations between Christopher Tinto and Christopher Santucci of Toyota and NHTSA representatives, with the result that certain relevant categories of incidents were excluded from Toyota's reporting of events.

123.  In its response to NHTSA's 2004 information request, Toyota denied that a defect existed, stated that no defect trend had emerged, and that its ETCS could not fail in ways its engineers had not already perceived.  Toyota reported 123 complaints that it said "may relate to the alleged defect."  Toyota excluded from its response, however, the following relevant categories of complaints, among others:

> (1) an incident alleging uncontrollable acceleration that occurred for a long duration;

(2) an incident in which the customer alleged that he could not control a vehicle by applying the brake; and

(3) an incident alleging unintended acceleration occurred when moving the shift lever to the reverse or the drive position.

124. Toyota thus concealed from NHTSA and the public an entire universe of potentially relevant customer complaints.

125. Toyota also failed to disclose expert reports concerning ETCS failure.  As discussed above, in May 2004, a forensic technologist and mechanical engineer examined a vehicle in New Jersey that had experienced a UA event.  Their report concluded that the vehicle's ETCS was not operating properly.  Toyota received the report on January 13, 2005, but did not disclose the results to NHTSA.

126. Internal documents show that Toyota management wanted to avoid NHTSA investigations.  For example, in September 2006, when ODI opened Defect Petition DP06-003 to investigate incidents relating to vehicle surging in 2002-2006 Camry and Camry Solara vehicles, Chris Santucci wrote to colleagues: "Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation."

127. Moreover, Toyota leadership sought to avoid any tough questions from NHTSA regarding ETCS.  In a February 27, 2007 e-mail to Christopher Santucci, Michiteru Kato wrote that he had decided against sending his most knowledgeable ECU engineer to an ECU demonstration being conducted for NHTSA to avoid questions regarding ECU failures: ". . . I thought that 3 guys from TMS is too many (two at most), and if the

engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU. (I want to avoid such situation)."

128. On March 2007, Toyota attempted to prevent NHTSA from opening an investigation in 2007 Lexus 350 vehicles, offering to send a letter to owners "reminding them not to install all weather mats on top of existing mats."  Acknowledging the potential harm to Toyota's bottom line, Chris Tinto wrote, "NHTSA feels that they have too many complaints on this one vehicle to drop the issue; The results of a stuck throttle are 'catastrophic.'"

129. Toyota also sought to keep information from the public regarding UA.  For example, in December 2005, Toyota sent letters to owners in connection with the NHTSA IS 250 All Weather Drive investigation.  An e-mail from Toyota employee George Marino reveals that Toyota Motor Company purposely removed any reference to speed control from the letters.  Marino wrote, "They pulled out the 'vehicle speed control' part.  NHTSA may come back, but TMC wanted to try."

130. Further, Toyota never fully disclosed to the regulators the actual numbers of customer reports of UA events in the various Toyota models under investigation that the company had received.  In fact, Toyota disclosed that it had received only 1,008 such complaints.  Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received 37,900 complaints potentially relating to sudden acceleration in defective vehicles from January 1, 2000 through January 27, 2010.

**D.** **Toyota's Use of The Floor Mat and Sticky Pedal Recalls as A Smoke Screen to Hide ETCS Defects**

131. Given the "potentially catastrophic" effects of an ETCS recall, Toyota tried to focus attention instead on "mechanical" problems, like floor mats and sticky pedals.  In an

email dated April 2, 2007, George Morino urged others within Toyota to re-frame the investigation as an "All Weather Floor Mat issue," and carefully eliminated reference to the much broader and more alarming issue of unintended acceleration:

> Sorry we had a last minute change to the Q&A.  Please utilize this revised version of the Statement and Q&A. The issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding
>
> unintended throttle control in the subject vehicles.
>
> [New]
>
> NHTSA received five consumer complaints where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

132.  A September 14, 2007 email from Chris Tinto demonstrates that internally, Toyota executives were pleased that NHTSA had limited the ES350 unintended acceleration issue to a "floor mat" recall, and that this limitation saved the company "upwards of one hundred million dollars:"

> Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off" switch.  We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

133.  In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that

it "ha[d] been quite successful in mediating." The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

134.  Further, Toyota continued to promote the floor mat recalls even though it knew that floor mat interference could not alone explain the propensity of certain makes and models to experience UA.  As of September 2007, Toyota executives internally acknowledged that that "floor mat interference is possible in any vehicle with any combination of floor mats."

**E.        Toyota's Agreement to Pay A $16.375 Million Fine for Hiding Safety Defects**

135.  On April 5, 2010, NHTSA informed Toyota in a letter that it was imposing a record $16.375 million fine for hiding safety defects related to sudden acceleration in 2.3 million vehicles.  Under federal law, automakers are required to disclose defects to NHTSA within five business days.  Yet, Toyota had failed to notify NHTSA for at least four months after learning that the accelerator pedals in some of its vehicles could stick and cause UA.  In its April 5th letter, NHTSA noted how Toyota had sent instructions to its European operations in September 2009 explaining how to fix sticky accelerator pedals, but decided not to provide the same instructions to U.S. dealers and government regulators.  The NHTSA letter indicated that Toyota may have known about the UA defects for at least three years.

136.  On April 19, 2010, Toyota agreed to pay the fine.  That same day, NHTSA Secretary Ray LaHood released a statement saying, "By failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

**F.** **Toyota Executives' Successful Concealment of The Defects Described Internally as A "Win" For the Company**

137. In May 5, 2009 Chris Santucci wrote an e-mail to Takeharu Nishida, a Toyota engineer, expressing pleasure that NHTSA would not ask Toyota to disclose all reports related to throttle issues in its pending investigation: "They [NHTSA] are struggling with sending an IR letter, because they shouldn't ask us about floor mat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floor mat-related.  So they should ask us for non-floor mat related reports, right?  But they are concerned that if they ask for other reports, they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them.  Does that make sense?  I think it is good news for Toyota."

138. Toyota took the same attitude toward the 2007 Floor Mat recall in a presentation dated July 6, 2009.  Toyota's lead executive in American  Operations, Yoshi Inaba, described as a "win" the fact that Toyota saved $100 million dollars by negotiating an "equipment" recall rather than some other alternative safety measure to address the sudden acceleration issue: "Wins for Toyota – Safety Group . . . Negotiated 'equipment' recall on Camry/ES re: SA, saved $100M+, w/ no defect found."  Toyota knew that it had saved millions of dollars through concealing the known potential for UA in its vehicles.

**G.** **Toyota's Concealment of Unintended Acceleration Defects and Incidents to Avoid The "Global" Ramifications of Disclosure**

139. An internal PowerPoint reveals that Toyota knew about recurring issues with UA.  A slide entitled, "Key Safety Issues" included the following:

- 'Sudden Acceleration' on ES/Camry, Tacoma, LS, etc.

- Recurring issue, PL/Design Implications.

140. A September 2009 Toyota internal document demonstrates how "global ramifications," rather than safety dictated Toyota's position with respect to "vehicle defect:"

> TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications.  In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.

141. On January 16, 2010, Irving Miller, a Toyota Executive, admitted "we need to come clean" about acceleration problems: "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options...We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business." Toyota knew about this mechanical tendency for failure for years and still has not properly disclosed it.

## H.    Toyota's Secret Recall Scheme

142. As discussed at length above, Defendants have engaged in a "secret recall" scheme to keep concealed a known and identified defect and to permit dangerous vehicles to remain on the road, and to avoid the cost of recalling and repairing the unsafe and defective vehicles.

143. Through this scheme, Defendants have been silently repairing defects that they continue to deny exist, keeping critical information from NHTSA and the public.

I.       **Toyota's Repeated Promises of Safety, Denial of The Defects, And Accusations Against Victims**

144.  In a June 19, 2004 letter to NHTSA, Toyota falsely stated that its ETCS contained a built-in redundancy to prevent acceleration, and that in the event of sudden acceleration the "vehicle brakes would have restrained vehicle motion."  Toyota maintained this position for years, even though it knew that Toyota-manufactured vehicles can and do experience sudden unintended acceleration and that application of the brakes has failed to restrain vehicle motion.

145.  Toyota consistently assured NHTSA and the public that the subject vehicles were not defective.  For instance, in August 2005, NHTSA opened Defect Petition DP05-002 to investigate a consumer's claims relating to unintended acceleration in the 2002 Camry.  Scott Yon again was assigned as NHTSA's investigator.  The target vehicle population was 1,950,577 Model Year 2002-2005 Camrys and Lexus ES models.  After receiving the petition and reviewing the underlying complaints, Toyota concluded:

> [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota believes that this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls.  Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls.  Toyota has not found any evidence on the subject vehicles of brake failure, let alone brake failure concurrent with ETC failure.

146.  Throughout the relevant period, Toyota discounted its customer's experience with UA.  For example, on September 22, 2005, Carol Hargrave of TMS' Customer Relations

Department wrote the following in a letter to a concerned Lexus owner who had complained to Toyota about her experiences of unintended acceleration:

a.  It is our understanding that you reported that you stepped on the brake pedal and the vehicle accelerated and that this has happened several other times.

b.  As you are aware your vehicle was inspected in regards to your concerns with the brakes and unintended acceleration.  **Your concerns could not be duplicated.** The throttle body was inspected and there was no binding and the cable operated freely. The vehicle was test driven and the brakes were functioning properly.  There were no codes to indicate any type of failure of the system.

c.  **It is virtually impossible for this type of incident to happen.**  The brakes and the throttle are two totally separate systems and both would have to fail at exactly the same time.  The brakes will always over ride the throttle."

(Emphasis added.)

147.  In October 2009, NHTSA announced NHTSA Campaign ID Number 09V388000 regarding the pedal entrapment defect, and the related Toyota Safety Recall 90L (Potential Floor Mat Interference with Accelerator Pedal) for certain model year 2004-2010 passenger vehicles, stating that:

The accelerator pedal can get stuck in the wide open position due to its being trapped by an unsecured or incompatible driver's floor mat.

A stuck open accelerator pedal may result in very high vehicle speeds and make it difficult to stop the vehicle, which could cause a crash, serious injury or death.

148.  On November 25, 2009, Toyota Motor North America, Inc. filed an amended defect report with NHTSA for Toyota Safety Recall 90L, stating that:

Dealers will modify the accelerator pedal and, on certain vehicles, alter the shape of the floor surface under the pedal. These changes address the risk of pedal entrapment due to interference with the floor mat. Redesigned accelerator pedals will become available in April 2010 and dealers will replace any modified pedal with the new pedal if desired.  Also, dealers will replace any genuine Toyota or Lexus all-weather floor mats with redesigned all-weather floor mats, or repurchase the previous mats from owners who do not want the new ones.

Additionally, software modifications will be installed on Camry, Avalon and Lexus ES 350, IS 350 and IS 250 models that will ensure that the brake overrides the accelerator in the event both brake and accelerator pedals are applied.

## V.     Facts of the Crash

149. Prior to the subject incident, Plaintiff purchased the 2015 Toyota Texas, for the purpose of safe and reliable transportation.

150. On August 13, 2021, at approximately 10:39 p.m., seventeen-year-old ADRIAN BARRAGAN CASTELLANOS was on his way home from his evening job when the subject vehicle suddenly and unexpectedly accelerated to dangerously high speeds. ADRIAN BARRAGAN CASTELLANOS was unable to control the rogue vehicle and it travelled off the roadway and collided with a tree.   ADRIAN BARRAGAN CASTELLANOS did not survive the crash resulting in survival damages to his estate and wrongful death damages to SONIA BARRAGAN

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## Negligence

169. Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

170. At all times herein mentioned, Defendants Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Sales, U.S.A., Inc., Toyota Motor Corporation, and DOES 1 through 10, inclusive ("Defendants"), designed, manufactured, assembled, analyzed, recommended, merchandised, advertised, promoted, distributed, supplied, and sold  to distributors and retailers for sale, the subject vehicle, and/or its component parts.

171. Defendants owed Plaintiff a duty to exercise reasonable care in the design, testing, manufacture, assembly, sale, distribution, and servicing of the subject vehicle, including a duty to ensure that the subject vehicle did not cause Plaintiff, other users, bystanders, or the public, unnecessary injuries, or deaths.

172. Defendants knew or should have known that the subject vehicle is defectively designed and inherently dangerous and has a propensity to suddenly accelerate, lose control, and cause injuries.

173. Defendants knew or should have known that the subject vehicle was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

174. Defendants failed to exercise ordinary care and breached their duties by, among other things:

   a. Failure to use due care in the manufacture, distribution, design, sale, testing, and servicing of the subject vehicle and its component parts in order to avoid the aforementioned risks to individuals;

     b. Failure to provide adequate warning of the sudden  acceleration problem and its propensity to cause and/or contribute to an accident;

     c. Failure to incorporate within the vehicle and its design reasonable safeguards and protections against sudden acceleration and the consequences thereof;

     d. Failure to make timely correction to the design of the subject vehicle to correct the sudden acceleration problems;

     e. Failure to adequately identify and mitigate the hazards associated with sudden unintended acceleration in accordance with good engineering practices and other ways; and,

     f. Were otherwise careless or negligent.

175. The aforementioned negligent acts and omissions of Defendants were the direct and proximate cause of Plaintiff's damages.

176. Plaintiff is, therefore, entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

177. WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### Strict Products Liability: Design Defect

178. Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

179. Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted,

marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its

component parts and constituents, which was intended by the Defendants, and each of

them, to be used for to be used as a passenger vehicle and for other related activities.

180. Defendants, and each of them, knew that said vehicle was to be purchased and used

without inspection for defects by Plaintiff and the general public.

181. The subject vehicle was unsafe for its intended use by reason of defects in its

manufacture, design, testing, components and constituents, so that it would not safely

serve its purpose, but would instead expose the users of said product to serious injuries.

182. Defendants designed the subject vehicle defectively, causing it to fail to perform as

safely as an ordinary consumer would expect when used in an intended or reasonably

foreseeable manner.

183. The risks inherent in the design of the subject vehicle outweigh significantly any

benefits of such design.

184. Plaintiff was not aware of the aforementioned defects at any time prior to recent

revelations regarding problems with Toyota vehicles.

185. As a legal and proximate result of the aforementioned defects of the subject vehicle, the

Plaintiff sustained the injuries and damages set forth herein while Plaintiff was using

the subject vehicle in a reasonably foreseeable manner.

186. Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

187. WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as

hereinafter set forth.

### THIRD CLAIM FOR RELIEF

### Strict Product Liability - Failure to Warn

188. Plaintiff hereby incorporates by reference and realleges all paragraphs previously alleged herein.

189. Defendants, and each of them, knew that the subject vehicle, and its component parts, would be purchased and used without inspection for defects in the design of the vehicle.

190. The subject vehicle was defective when it left the control of each of these Defendants.

191. At the time of the subject vehicle's design, manufacture, and sale, and continuing up to the time of Plaintiff's injury, Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of these vehicles, whose defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden unintended acceleration and thereby cause injuries

192. Defendants knew that these substantial dangers are not readily recognizable to an ordinary consumer and that consumers would purchase and use these products without inspection.

193. At all relevant times, Defendants failed to provide adequate warnings, instructions, guidelines, or admonitions to members of the consuming public, including Plaintiff, of the defects, which Defendants knew, or in the exercise of reasonable care should have known, to have existed in the subject vehicle, and its component parts.

194. At the time of Plaintiff's injuries, the subject vehicle was being used in the manner intended by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

195. Plaintiff's damages were the legal and proximate result of Defendants' failure to provide adequate warnings.  Defendants owed Plaintiff a duty in designing, manufacturing, warning about, and distributing the subject vehicle.

196. WHEREFORE, Plaintiff pray judgment against Defendants, and each of them, as hereinafter set forth.

## ADDITIONAL ALLEGATIONS REGARDING CLAIM

## FOR PUNITIVE DAMAGES

221. Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

222. At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that the subject vehicles were defective and dangerous.

223. At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that numerous people had been injured or killed by Toyota vehicles.

224. Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested, or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle, and its component parts, a product which said Defendants knew to be dangerous and unsafe for the purpose for which they intended it to be used, namely, as a passenger vehicle.

225. At all times herein mentioned, prior to and at the time that Defendants sold the subject vehicle to Plaintiff, and prior to the time that said product was used, the Defendants knew, or should have known, that the subject vehicle, and its component parts, was defectively designed and manufactured, that it had extremely dangerous properties and defects, and that it had defects which would cause serious injuries and damage to users of said

product, thereby threatening the life and health of the users.  Further, at all times, all Defendants knew that the defects in the subject vehicles had caused serious injuries and damage to other users of these vehicles.

226. At all times herein mentioned, all Defendants, despite the actual knowledge described hereinabove, intentionally suppressed the aforementioned user complaints, criticisms, and other information to keep their knowledge from the general public, including Plaintiff, and failed to take any steps to warn Plaintiff, or other members of the general public, of the dangers of using the subject vehicle.

227. At all times herein mentioned, Defendants had actual knowledge of the facts hereinabove alleged demonstrating that serious injury to users of the subject vehicle, including Plaintiff, would potentially result.  Defendants nevertheless deliberately failed and refused to recall the subject vehicle, or to take any other effective steps whatsoever to prevent such injuries.  Defendants misrepresented the safety of the subject vehicle, and failed and refused to take any steps to prevent injuries from said vehicle, in order to increase the profits of Defendants from the sale of said vehicle.

228. At all times herein mentioned, Defendants conspired to engage in a secret recall scheme to avoid the cost of recalling and repairing the unsafe and defective vehicles.  Defendants have flouted the Vehicle Safety Act by failing to notify NHTSA that certain of their vehicles have defects in their ETCS, by failing to provide NHTSA and the public an opportunity to review their proposed

remedies, and by silently installing unauthorized fixes on only those vehicles that happen to come in for service.

229. As a legal and proximate result of Defendants' conduct, as herein alleged, Plaintiff sustained the injuries and damages set forth above.

230. Defendants' conduct, as set forth above, in allowing such an extremely dangerous product to be used by members of the general public, including Plaintiff, constitutes fraud, malice and oppression toward Plaintiff and others, and a conscious disregard of the safety of Plaintiff and others.

231. Plaintiff is therefore entitled to exemplary or punitive damages, which would serve to punish the Defendants and to deter wrongful conduct in the future.

232. WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests of this Court the following relief:

A. For all wrongful death and survival damages, in an amount to be proven at the time of trial;

B. For medical, and funeral expenses associated with ADRIAN BARRAGAN CASTELLNOS' injuries and death in an amount to be proven at the time of trial;

C. Loss of the support, care, love, comfort, and companionship of ADRAIN BARRAGAN CASTELLANOS in an amount to be proven at the time of trial;

D. For property damage and property loss, including damage to, and loss of use of, the subject vehicle;

E. For an award of pre-judgment and post-judgment interest as provided by law;

F. For consequential damages, in an amount to be proven at the time of trial;

G. For exemplary or punitive damages against Defendants Toyota Motor North America,

Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor

Sales, U.S.A., Inc., and Toyota Motor Corporation, as provided by law;

H. For an award providing for payment of costs of suit;

I.  For such other and further relief as this Court may deem just and  proper.

Dated:  April 20, 2022

Respectfully submitted,

**PROVOST ★ UMPHREY LAW FIRM, L.L.P.**
350 Pine Street, Suite 1100
P.O. Box 4905
Beaumont, Texas 77701
(409) 835-6000
Fax (409) 813-8605

By:     */s/ Christopher T. Kirchmer*
      CHRISTOPHER T. KIRCHMER
      State Bar No. 00794099
      ckirchmer@pulf.com
      FABIANA BAUM
      State Bar No. 24101489
      fbaum@pulf.com

ATTORNEYS FOR PLAINTIFF

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury on all issues that may be tried by a jury.

*/s/ Christopher T. Kirchmer*